UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AARON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-1276 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Believing he is entitled to Social Security disability benefits, plaintiff Aaron Smith ("Smith") filed this suit challenging the Commissioner of Social Security's final decision denying benefits.[1] For the reasons set forth below, the Court affirms the decision of the Commissioner.

**I. BACKGROUND**

Plaintiff applied for supplemental security income, but his claim was denied. Plaintiff requested a hearing, which was held on June 17, 2020.

On September 1, 2020, Administrative Law Judge Edward Studzinski issued a nineteen-paged, single-spaced decision in which he concluded that plaintiff was not disabled within the meaning of § 1614(a)(3)(A) of the Social Security Act. Plaintiff asked for review by the Appeals Council. On or about January 21, 2021, the Appeals Council denied the request for review.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi ("Kijakazi") has been automatically substituted as defendant in this matter.

Plaintiff timely filed this action and requests a remand. Defendant asks the Court to affirm the ALJ's decision.

**II.    DISCUSSION**

An individual denied benefits "after any final decision of the Commissioner of Social Security" may "obtain review of such decision by civil action" filed within 60 days. 42 U.S.C. § 405(g). This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

That section also states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Thus, in considering an appeal, this Court "will affirm a decision on disability benefits if the ALJ supported her conclusion with substantial evidence." *Prill v. Kijakazi*, 23 F.4th 738, 746 (7th Cir. 2022) (quoting *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021)). Substantial evidence "means—and only means—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). In considering whether substantial evidence supports the decision of the Administrative Law Judge, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022).

The "burden of proving [he] is disabled" rests with the claimant. *Prill*, 23 F.4th at 746. Pursuant to statute, a person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A person is considered disabled:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c(a)(3)(B).

Thus, to "determine whether a claimant is eligible for disability benefits, an ALJ applies a five-step sequential evaluation process to determine whether a claimant can engage in substantial gainful employment." *Prill*, 23 F.4th at 746. In those five steps, the ALJ considers whether:

> (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Prill*, 23 F.4th at 747 (citations omitted). The claimant has the burden of proof at the first four steps, and the Commissioner has the burden at the fifth. *Prill*, 23 F.4th at 747.

In this case, the ALJ proceeded through all five steps. At step two, the ALJ determined that plaintiff has three severe impairments, including depression, bipolar disorder and personality disorder. (A.R. 20).[2] At step three, the ALJ concluded that Smith does not have an impairment or combination of impairments that meets or exceeds the listings for a severe impairment.

---

[2] The Administrative Record ("A.R.") is located at docket entry 9-1, 9-2 and 9-3.

3

Plaintiff does not take issue with the ALJ's step-three findings. (At the hearing before the ALJ, plaintiff's counsel stated that she was not arguing for a listed impairment. (A.R. 49).)

At step four, the ALJ concluded that plaintiff:

> has the residual functional capacity to perform work at all exertional levels with no restriction of his ability to lift and/or carry, sit, stand or walk throughout an 8-hour workday. He is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working on ladders or at unprotected heights, and he should avoid concentrated exposure to unguarded hazardous machinery. In addition, the claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. He ought not perform work which requires multitasking. He could perform work requiring an average production pace, but is incapable of significantly above average or highly variable production pace work. He ought not perform work which requires significant self-direction. He is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public, which is incidental to his primary job duties. He ought not work in crowded, hectic environments. He can tolerate brief and superficial interaction with co-workers and supervisors as is common in unskilled work, but is not to perform teamwork or tandem tasks.

(A.R. 22-23). In reaching that conclusion, the ALJ spent eight single-spaced pages carefully summarizing plaintiff's medical history. (A.R. 23-31). He then explained:

> Following a careful review of the objective medical record, I am persuaded that the claimant's mental impairments and symptoms impose moderate limitations. The record is supportive that the claimant has a need for mental health treatment and medication management in order to develop appropriate coping skills. The claimant testified that he has led an 'unsettled life' including multiple arrests and fights with his significant other. Indeed, the record documents a lengthy history of legal problems and incarcerations, often for domestic issues. It is noted that when the claimant is faced with legal problems, he often threatens self-harm, leading to evaluation and inpatient hospitalizations for treatment. However, I am not persuaded that this behavior represents a work-preclusive medically determinable impairment.
>
> Indeed, despite a number of inpatient hospitalizations, there is no opinion from any doctor stating that the claimant cannot work or is disabled. Moreover, these records make reference to drug seeking and dramatic behaviors that indicate that the claimant is often focused on staying out of jail. Mental status examinations seen throughout the record are generally within normal limits and the claimant has

often reported that his mood is 'great'. The claimant has also reported an ability to perform a number of daily activities including household chores, preparing food, managing funds, and using public transportation. This demonstrates some ability for planning and focusing, and following through on tasks.

The claimant testified to having a number of jobs throughout the period in question and stated that his primary issue with working has been missing too much work due to hospitalizations. He admitted that he has left the job on occasion. The claimant also testified that Seroquel is helpful for his symptoms but that it makes him tired with some difficulty focusing and that if he stops taking his medication, he experiences psychosis and suicidal ideation. As noted above, the record does support an increase in symptoms when the claimant does not take his medication as prescribed and also shows that the claimant's mental status and behavior stabilizes with medication and treatment. I also note that the record shows a large gap in treatment/psychiatric hospitalizations from November 2015 through October 2017, which is inconsistent with claimant's allegations. Additionally, the record shows that the claimant was working during this period and while not at the substantial gainful activity level, was at his highest earnings level from 2016 to 2017.

However, I recognize the claimant's multiple hospitalizations and find that the record demonstrates a need for consistent treatment and medication management. The residual functional capacity limits the claimant to work in non-hazardous environments with simple routine tasks involving no more than simple decision making, no more than occasional and minor changes in the work setting, no multitasking, and requiring the exercise of only simple judgment. This also includes pace production limitations to the average level, to attenuate workplace stressors and avoid triggering the claimant's symptoms. While the claimant testified to having altercations with supervisors or coworkers, this is not documented in the record. However, in considering the claimant's history of incarcerations, domestic issues, and notations of rude, disrespectful, and demanding behaviors, the residual functional capacity also includes social limitations and precludes work involving direct public service.

* * *

There is no statement by any treating or examining source stating that the claimant is disabled or is further limited than set forth in the residual functional capacity.

The state agency physicians assessed moderate limitations in understanding, remembering, and applying information, interacting with others, with regard to concentration, persistence, or maintaining pace, and in adapting and managing oneself. They opined that the claimant has the cognitive capacity to perform and sustain one and two-step tasks of a routine and repetitive type within any limitations of physical findings. The claimant retains sufficient attention and concentration to persist at and complete work activities for the usual periods required in the general work force. The claimant has the capacity for adequate

5

> pace and perseverance to maintain a schedule and on time attendance and has the capacity to complete a normal workday and work week on a regular basis. They opined that the claimant is able to perform at minimally acceptable rates on a regular basis. They opined that the claimant is able to perform at minimally acceptable rates requiring only the common frequency and lengths of rest breaks. Psychologically based symptoms would not markedly impair his capacity to complete a normal workweek. The claimant has limited social tolerance and would do best in a socially undemanding and restricted setting that requires reduced interpersonal contact away from the public. He could relate acceptably with a supervisor and coworkers to the minimally necessary degree. The claimant retains the capacity to utilize public transportation to and from a place of work.
>
> These assessments are persuasive as they remain well supported by objective clinical findings seen throughout the record and are uncontradicted. This is generally consistent with the claimant's testimony and presentation at the hearing.
>
> I recognize the global assessment of functioning (GAF) scores of 30 and 37 seen in the record. These are not persuasive. The GAF score is only a snapshot opinion about the level of functioning and does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis. The GAF does not measure the ability to meet the mental demands of unskilled work and there have been no published studies of how, or if, GAF scores relate to meeting the demands of unskilled work. Additionally, there is no correlation between GAF scores and paragraph B criteria in the mental disorder listings. Further, it is noted that a GAF score also includes psychosocial factors.

(A.R. 31-33) (internal citations omitted).

The ALJ next concluded that plaintiff had no prior relevant work experience. Finally, at step five, the ALJ, based in part on the testimony of a vocational expert, concluded that "claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Accordingly, the ALJ concluded that plaintiff is not disabled.

Plaintiff takes issue with the findings the ALJ made in assessing his residual functional capacity. First, plaintiff argues that the ALJ failed to account for the impact that plaintiff's "repeated hospitalizations" have on his ability to work. The Court disagrees. The ALJ specifically considered this issue, explaining first:

> the record documents a lengthy history of legal problems and incarcerations, often for domestic issues. It is noted that when the claimant is faced with legal

6

> problems, he often threatens self-harm, leading to evaluation and inpatient hospitalizations for treatment. However, *I am not persuaded that this behavior represents a work-preclusive medically determinable impairment*.

(A.R. 23) (emphasis added). The ALJ went on to explain that "despite a number of inpatient hospitalizations, there is no opinion from any doctor stating that the claimant cannot work or is disabled." (A.R. 32). The ALJ proceeded to consider plaintiff's ability to perform daily activities, plaintiff's testimony about his abilities, plaintiff's work history and plaintiff's medical records. The ALJ noted that the state agency physicians had opined that plaintiff's "[p]sychologically based symptoms would not markedly impair his capacity to complete a normal workweek." (A.R. 32). The Court will not reweigh the evidence, and plaintiff points to no contrary evidence. The ALJ built the necessary logical bridge to his conclusion as to plaintiff's residual functional capacity.

Plaintiff also suggests the ALJ ignored plaintiff's symptoms of mania. As plaintiff notes, the ALJ stated that plaintiff's "[m]ental status examinations seen throughout the record are generally within normal limits and the claimant has often reported that his mood is 'great.'" (A.R. 31). The ALJ cites nine exhibits to support that statement. The plaintiff argues that one of those exhibits—notes from a February 2, 2020, evaluation—include a description of symptoms, such as racing thoughts and fast speech, that are consistent with mania. Plaintiff seems to think the ALJ ignored these symptoms, but the Court disagrees. The ALJ specifically considered the notes from that visit, explaining, among other things:

> [A]t a psychiatric evaluation through the DuPage County Health Department on February 3, 2020, the claimant reported that his mood was "great" and denied sadness or hopelessness. . . . Mental status evaluation noted *fast speech and an expansive affect*. The claimant was fully oriented with no apparent memory impairments, perceptual disturbances, or delusions. . . . The claimant was continued on his current medications, quetiapine for mood stability, and escitalopram for anxiety. Examiner Susan Dunne, APN, LPHA, declined to prescribe a stimulant at this time and discussed the risks of dependence. She

7

>noted that daily cannabis use and not working also increased the risk of mood instability.

(A.R. 30). Thus, the ALJ considered the symptoms of mania and the fact that the provider refused to prescribe a stimulant. The ALJ weighed the evidence from this and many other medical visits. The Court is not at liberty to reweigh the evidence.

Next, plaintiff argues that the ALJ should have considered the extent to which plaintiff's bipolar disorder was "a possible reason for" (Plf. Brief at 15) or "may have been a reason" (Plf. Brief at 13) for plaintiff's prior noncompliance with his medication. The Court disagrees. The ALJ acknowledged that plaintiff needs to maintain his medication. (A.R. 31). The ALJ also noted that "claimant testified that he has found the right medications after several years of trying different medication combinations." (A.R. 24). In addition, the ALJ noted that plaintiff testified that he had had issues with "medication compliance in the past but is now taking all medications as prescribed." (A.R. 24). Although plaintiff testified that he had "sometimes stopped medication due to side effects" (A.R. 24), a fact which the ALJ considered, plaintiff points to no record evidence that suggests plaintiff's bipolar disorder caused plaintiff's prior issues complying with medication. The plaintiff would have preferred that the ALJ *assume* bipolar disorder had some effect on plaintiff's ability to comply with medication. The ALJ, however, is not allowed to play doctor and assume how a disorder affects a claimant. In sum, the plaintiff does not identify any errors the ALJ made in assessing plaintiff's ability to comply with medication.

The plaintiff also argues that the ALJ erred in discounting plaintiff's GAF (global assessment of functioning) scores as "snapshots." Specifically, the ALJ explained that he was not persuaded by two low GAF scores, because a GAF score, rather than providing a "longitudinal picture of" plaintiff's functioning for purposes of a disability analysis, is merely a

8

snapshot of one moment in time. (A.R. 32). The ALJ also explained that a GAF "does not measure the ability to meet the demands of unskilled work" and that "no published studies" show any correlation between GAF scores and ability to work. (A.R. 32-33). The ALJ's consideration of plaintiff's GAF scores is consistent with Seventh Circuit precedent. The Seventh Circuit, too, has described these scores as a "snapshot." *Sambrooks v. Colvin*, 566 Fed.Appx. 506, 511 (7th Cir. 2014) ("But a GAF score is nothing more than a snapshot of a particular moment."). The Seventh Circuit has also explained that a GAF score is "useful for planning treatment" but "does not reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ did not err in finding the GAF scores not to be persuasive or determinative of plaintiff's residual functional capacity.

Finally, the Court has reviewed the ALJ's assessment of plaintiff's residual functional capacity and finds that it is supported by substantial evidence.

## IV. CONCLUSION

For all of these reasons, the Court affirms the decision of the Commissioner. Judgment shall enter in favor of defendant. Plaintiff's motion [13] for judgment is denied. Civil case terminated.

**SO ORDERED.**  ENTERED: July 15, 2022

_____
**HON. JORGE ALONSO**
**United States District Judge**